CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

NIKHIL BHAGAT (CABN 279892)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7193
    FAX: (415) 436-6982
    nikhil.bhagat@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br> v.<br><br>CASEY ROBERT GOONAN,<br><br>    Defendant. | Case No. CR 24-0414-JSW<br><br>**GOVERNMENT'S SENTENCING MEMORANDUM**<br><br>Sentencing Date:  September 23, 2025<br>Sentencing Time:  1:00 p.m.<br><br>Before: The Honorable Jeffrey S. White |

## TABLE OF CONTENTS

I.    Procedural History ........................................................................................................5

II.   The Sentencing Guidelines ...........................................................................................5

III.  The Nature and Circumstances of the Offense ............................................................6

    A.    June 1, 2024 Firebombing of UCPD Vehicle .....................................................6

    B.    June 11 Attempt to Firebomb the Interior of the Oakland Federal Building......6

    C.    June 13 and June 16 Arsons on the UC Berkeley Campus..................................8

    D.    Other Evidence Relating to the Defendant's Premeditation and Planning.........9

IV.   Defendant's History and Characteristics ....................................................................11

    A.    Defendant's Personal Characteristics ...............................................................11

    B.    Defendant's Communications While in Pretrial Detention ...............................11

    C.    Defendant's Criminal History and Conduct While in Custody .........................18

    D.    Defendant's Years-Long Advocacy for Political Violence ...............................19

V.    General Deterrence ......................................................................................................19

VI.   Specific Deterrence .....................................................................................................20

VII.  The Need for the Sentence to Protect the Public from Further Crimes of the
Defendant.............................................................................................................................21

VIII. Conclusion ..................................................................................................................22

# TABLE OF AUTHORITIES

## Cases

*United States v. Babafemi*, No. 13-cr-0109, 2021 WL 1210313 (E.D.N.Y. Mar. 31, 2021)……………20

*United States v. Carillo*, Case No. 4:20-CR-265-YGR (N.D. Cal.)……………………………………..20

*United States v. Depape*, Case No. 3:22-CR-426-JSC (N.D. Cal.)……………………...……………20

*United States v. El-Jassem*, 819 F.Supp.166 (E.D.N.Y. 1992)……………………………………………..20

*United States v. Onuoha*, 820 F.3d 1049 (9th Cir. 2016)…………………………………………………19

*United States v. Tankersley*, 537 F.3d 1100 (9th Cir. 2008)....................................................................... 5

## Statutes

18 U.S.C. § 844...................................................................................................................................... 9

26 U.S.C. § 5861…………………………………………………………………………..5

*"Loot shops, shoot cops, steal crops."*

*"Not to help it all, but i also continuously find myself ruminating on the single mistake which opened up the door for an FBI investigation and to be identified as a 'suspect' on June 1st. If I hadn't returned to the scene several hours later to take a photo for the communique (which I thought wouldn't be noticeable because hundreds of people were out walking in the afternoon on UCB campus), then they wouldn't have had any reason to suspect <u>me</u> at all . . . . there was no face and no trace on all 5 actions if that hadn't happened. If that opening wasn't made, i'd probably still be on the streets!"*

*"One amusing point to mention is that the federal building I attempted to burn down is the very courthouse that my hearings [h]ave been held at."*

*"Death to amerikkka / Glory to the martyrs"*

On October 7, 2023, the international terrorist group Hamas, joined by other Palestinian militant organizations, launched a deadly attack on the state of Israel. The death toll numbered 1200, including hundreds of civilians. Yet other civilians were kidnapped, and by some accounts, tortured and sexually assaulted.  Hamas termed the operation "al-Aqsa Flood."  Casey Goonan, inspired by this attack, went on his own reign of terror: Operation Campus Flood.  Over the course of several weeks, he firebombed a police car, attempted to firebomb the Oakland federal building, and set fires on the campus of the University of California, Berkeley.  After each attack, he posted an anonymous online manifesto explaining that his actions were in furtherance of his political beliefs and calling on others to join him. And even after being arrested and pleading guilty to his crimes, he has refused to show any remorse and in fact has taken substantial steps to continue to publicize his actions and recruit others to his cause.

The defendant is a highly-educated, unrepentant domestic terrorist who sought to use violence against law enforcement officers and the federal government.  In light of Goonan's serious criminal conduct, the motivation for his crimes, his pervasive and deeply held violent beliefs, his utter lack of remorse for his crimes, and his continuing danger to the community, the Court should impose a sentence of 188 months in the custody of the Bureau of Prisons, followed by a term of 15 years of supervised release, restitution of $94,267.51, and a $100 special assessment.  The Court should also recommend that the Bureau of Prisons house the defendant in a facility containing a communications management unit.

## I.     Procedural History

On June 26, 2024, the defendant was charged by criminal complaint with a violation of 18 U.S.C. § 844(f)(1).  Criminal Complaint, ECF No. 1.  On July 24, 2024, the grand jury returned an Indictment charging him with violations of 18 U.S.C.§ 844(f)(1), 18 U.S.C. § 844(i), and 26 U.S.C. § 5861.  *See* Indictment, ECF No. 11. On January 14, 2025, the defendant pleaded guilty to Count Two of the Indictment pursuant to a plea agreement.  ECF No. 24.  The Court initially set sentencing for April 8, 2025. *Id.*  Thereafter, sentencing was continued to June 10, 2025 (ECF No. 27), July 1, 2025 (ECF No. 28), July 22, 2025 (ECF No. 30), and then to the current date, September 23, 2025 (ECF No. 32).

## II.     The Sentencing Guidelines

The parties and the probation officer agree that the applicable Guidelines are as follows. Because Goonan's arsons involved "a state or government facility,"—a UC police vehicle and a federal government building—a base offense level of 24 applies.  *See* PSR ¶ 38.  Because Goonan's offense involved and was intended to promote a federal crime of terrorism, 12 points are added. *Id.* ¶ 40.  He receives a two-level reduction for acceptance of responsibility, and the government hereby moves for a further one-level reduction because Goonan has timely notified authorities of his intention to plead guilty.[1]  *See id.* ¶¶ 45–46.  That leaves him with an adjusted offense level of 33. *Id.* ¶ 47. "[T]hrough the terrorism enhancement Congress wanted to impose a harsher punishment on any individual who committed an offense that involved or intended to promote one of the enumerated terrorist acts, and intended, through that offense, to influence the conduct of others."  *United States v. Tankersley*, 537 F.3d 1100, 1113 (9th Cir. 2008).  Accordingly, because Goonan has been convicted of an offense involving a federal crime of terrorism, under the Guidelines, his criminal history category is VI.  PSR ¶ 53.  That would ordinarily lead to an advisory Guidelines range of 235 to 293 months, but because the

---

[1] As described in more detail below and in the PSR, *see, e.g.,* PSR ¶ 36 & sent. rec., Goonan does not have remorse for his criminal conduct.  But remorse is not the same as acceptance of responsibility.  Here, the defendant truthfully admitted his criminal conduct and entered a guilty plea before trial.  That is sufficient for acceptance of responsibility under the Guidelines.  *See* U.S.S.G. § 3E1.1 & nn. 1, 3.

statutory maximum sentence for the crime of conviction is 240 months, Goonan's adjusted Guidelines range is 235 to 240 months.  PSR ¶ 94.

## III.    The Nature and Circumstances of the Offense

### A.    June 1, 2024 Firebombing of UCPD Vehicle

On June 1, 2024, the defendant—wearing a mask to cover his face and wearing dark clothing—approached a marked University of California Police Department (UCPD) vehicle parked on the edge of the Berkeley campus.  He placed six Molotov cocktails directly under the car's fuel tank, ignited them, and quickly fled. *See* Aff. of Tiffany Speirs in Supp. of Crim. Complaint ("Complaint") ¶ 19, ECF No. 1; PSR ¶ 8.  The patrol car caught fire.  Complaint ¶ 18; PSR ¶ 7; Declaration of Nikhil Bhagat ("Bhagat Decl."), Ex. A (video of attack).  A witness saw the flames and ran into the station to alert officers about the attack leading UCPD officers to rush out of the station and extinguish the fire.  *Id.*  The firebombing engulfed the vehicle's rear seats, trunk, and fuel port.  PSR ¶ 7.  Hours later, Goonan returned to the scene of the crime and took a picture of the destroyed vehicle. *See* Complaint ¶ 21.

The following day, Goonan made an anonymous Internet post about the attack, including the picture of the damaged vehicle.  Goonan took responsibility for the act, expressing that it was intentionally "placed between the tire and underside of the fuel tank," and contended that the Molotov cocktail device "ha[d] enough fuel in it to torch the entire car if it was successfully placed."  PSR ¶ 9.  The post then began to list a long series of grievances, including a complaint about the police response to protests at another University of California campus, and expressing solidarity with those who faced what Goonan termed "genocidal state violence here in the Bay Area."  The post closed, "Death to amerikkka / Glory to the martyrs."  *See id.*

### B.    June 11 Attempt to Firebomb the Interior of the Oakland Federal Building

On June 10, 2024, activists set up tents on the premises of the Philip Burton Federal Building and U.S. Courthouse in San Francisco, blocking the public entrance to the building along Golden Gate Avenue.  After they failed to heed lawful commands to disperse, Federal Protective Services officers took action to clear them from the premises.  *See generally* Joe Kukura, *Pro-Palestine Protesters Set Up Encampment Outside SF Federal Building, But Police Clear it Quickly*, SFist, *available at*

https://sfist.com/2024/06/11/pro-palestine-protesters-set-up-encampment-outside-sf-federal-building-but-police-clear-it-quickly/ (Jun. 11, 2024).

On June 11, 2024, Goonan arrived at the 12th Street entrance to the Oakland Federal building. He was carrying a bag containing three Molotov cocktails.  He arrived at the building aiming to break a window and <u>throw lit Molotov cocktails into an office in the interior of the building</u>.  Plea Agmt. 3:23–3:24; PSR ¶ 13. The office belonged to the United States Railroad Retirement Board.  Plea Agmt. 3:27–4:1. Although ultimately unsuccessful in his quest, Goonan caused thousands of dollars in damage to the building:



While trying to break the window so he could toss the lit Molotov cocktails inside, Goonan was interrupted by an on-duty protective services officer (PSO) and an off-duty PSO.  Plea Agmt. at 3:24–3:25. As Goonan absconded from the officers, he dropped the bag containing the Molotov cocktails into a planter that abuts the building, lit it on fire, and fled.  *See* PSR ¶ 12.

Within hours, Goonan posted about this attack, too.  He took credit for smashing windows and lighting a firebomb at the Oakland federal building, saying that it was in retaliation for the clearing of the encampment at 450 Golden Gate the day before.  PSR ¶ 13.  Goonan called himself an "insurgent," and noted that although he was "unsure if the firebomb caught hold of the [federal] building front . . . . [w]hen the pigs mess with our people we must retaliate to level the score. *Redirect the violence back at the rulers and managers of the global Settler empire*." *Id.* (emphasis added).

### C.    June 13 and June 16 Arsons on the UC Berkeley Campus

In the early morning hours of June 13, 2024, Goonan lit a fire near Koshland Hall on the UC Berkeley campus.  Plea Agmt. at 4:13–4:14. Consistent with past practice, shortly thereafter he again took credit for the arson in an online post titled "UCLA Students Were Attacked Last Night So We Retaliated With a Firebomb on UCB Campus."  PSR ¶ 15.  Apparently upset with the actions of campus police at UCLA, he "retaliated with a firebomb on UCB campus."  He wasn't sure what building he hit, and he didn't care: in Goonan's view, "every single building on the UC Berkeley Campus deserves to be incinerated following the UC System's treatment of student protestors [sic]."  The post concluded with a threat: "UC SYSTEM MUST DIVEST FROM ISRAEL OR FACE OUR WRATH OF REVENGE. BLESSED IS THE FLAME."  *See* Plea Agmt. at 4:16–4:18; PSR ¶¶ 15, 16.

On June 16, 2024, in the middle of the afternoon, Goonan returned to the UC Berkeley campus and lit fire to a construction site.  PSR ¶ 17.  This attack showed a new level of sophistication; in addition to wearing a mask and gloves, like in other attacks, surveillance cameras show that he changed clothes during the attack.  *See* Bhagat Decl. Ex. B at 3–4 (FBI analysis describing relevance of evidence found to June 16 attacks).  When the FBI and other law enforcement agencies searched Goonan's room, they located planning documents that closely matched Goonan's ingress and egress to the campus during the June 16 fire. *See* Bhagat Decl. Ex. C.

Within hours, Goonan posted about the June 16 attack, this time recapping what he called "Operation Campus Flood," and setting forth his myriad reasons: (1) retaliation against the UC Police Department for its "attacks" on students at the Santa Cruz and Los Angeles campuses; (2) an effort to create destruction until the University of California system divested from Israel; (3) solidarity with those who were displaced from Berkeley's People's Park; (4) retaliation for the University of California,

Berkeley administration's "stealing the land called people's park"; and (5) for fathers who had lost children. *See* PSR ¶ 18. The post ended with the date and "1312," which is code for "all cops are bastards." *Id. See also* PSR ¶ 24 (describing meaning of 1312). Both the June 13 and June 16 arsons were part of Goonan's call to others to attack Bay Area college campuses. PSR ¶ 19.

Goonan called the June 2024 series of attacks "Operation Campus Flood," after "Operation al-Aqsa Flood," Hamas's name for its October 7, 2023 attack on Israel, in which it killed approximately 1,200 people and took 240 citizens hostage. *See* PSR ¶ 19; Ord. Granting Mot. to Dismiss & Denying Mot. for Prelim. Inj. at 1, *Defense for Children Int'l-Palestine v. Biden*, No. 23-cv-5829 (N.D. Cal. Jan. 31, 2024).

### D.    Other Evidence Relating to the Defendant's Premeditation and Planning

The day after the June 16 arson, state and federal law enforcement officers executed search warrants on Goonan's residences in Oakland and Pleasant Hill. In his room at his parents' house, they found, inter alia, a 24-page pamphlet that the defendant had created, seeking to spread his propaganda to others and teach them how to commit crimes without detection. *See* Bhagat Decl. Ex. D (pamphlet); Plea Agmt. at 5:3–5:4 (admitting authorship). Among other things, the pamphlet advocated that there was "only one response" to the United States government—to "burn its policing and military infrastructure and institutional bases of violence/dominance/power to the ground." *Id.* at USA-002849. It also provided detailed instructions to all who would seek to follow in Goonan's footsteps and participate in his "Operation Campus Flood" to take care to avoid being captured on surveillance cameras, to cover their faces, avoid leaving DNA, and avoid being tracked by their cell phone. *Id.* at USA-002850–USA-002851. The pamphlet also declared: "Gasoline, glass bottles, burned oil and rags are easily acquired. Also other materials with which one can attack the system and its cops can easily be found. *Id.* at USA-002851. For us, *all means that are in accordance with the ends are weapons that can be directed against power. Maybe some are more destructive than others, but no any means gets ideological overrating over another." Id.* (emphasis added). Goonan also reproduced another internet post that he authored, describing his true intentions for Operation Campus Flood: disappointed with the results of peaceful protest, he declared, "All you need is three people and some hammers and ATTACK THE GLASS." *Id.* at USA-002859. *See also* Plea Agmt. 5:4–5:7 (admitting authorship). Alternatively,

Goonan suggested, "There are also other options, much more stealth, quiet, and cost effective for us (and massively debilitating to them). For example, we could simply TORCH the buildings and artificial landscapes that colonize the land these universities occupy." Bhagat Decl. Ex. D at USA-002858. The essay ended with the following rhetorical question: "Or, if taking space gets us arrested in nearly every new encampment or demo[nstration] (exposing us to massive state surveillance and network mapping) then is a *direct attack* at the point of production on these campuses not the only viable option that remains?" *Id.* at USA-002859 (emphasis added). "These actions, if multiplied and done en mass can create a decisive rupture condition, which has the potential to force the divestment of Bay Area college systems from ties to not only Israel the settler state, but ties with U.S. weapons manufacturers involved in militarization across the world. And if they refuse, we should simply burn their shit down." *Id.* at USA-002855. Goonan included a picture of the burned police car that he destroyed on June 1. *Id.* at USA-002857. Goonan expressed his anger not only at universities and the government, but at those who shared his beliefs but who sought to remain peaceful:

> *We need to defend revolt instead of letting liberals who hate uprisings demonize militant protest.* Resisters instead should experiment with group-based and lone-wolf attacks on the key infrastructure (buildings, mainframes, technology) of the Universities and their built landscape. Trees, bushes, and dried grass makes quiet and quick attacks easy.

*Id.* at USA-002855 (emphasis added).

In Goonan's room, agents found ample evidence of his disregard for the law. One sticker read "Fuck shit up, don't get caught." Bhagat Decl. Ex. E at USA-003027. Another, "Do what's right not what's legal." *Id.* at USA-003036. A printout dated March 27, 2024 argued that individuals should slash the tires of security vans because security guards are "auxiliary of the prison and police state," and should set fire to prisons. *Id.* at USA-003048. Agents found a pencil drawing depicting a grenade and a Molotov cocktail, surrounded by the words "Anarchy Studies" "FTP". *See id.* at USA-003089. Goonan also possessed a color pamphlet that was produced by Hamas entitled "Our Narrative…Operation Al-Aqsa Flood," a well-known propaganda piece that set forth Hamas's justifications for its violent attack on civilians in October 2023. *Id.* at USA-0003184. A posterboard in Goonan's room contained printouts tilted "The Simplest Way to Burn a Vehicle," and "Minimizing DNA Traces During Riotous Moments." *Id.* at USA-000968.

1      Finally, agents found two maps in Goonan's room depicting his arson plans and depicting the

2  Berkeley campus and surrounding areas.  *See* Bhagat Decl. Ex. C.

3  **IV.    Defendant's History and Characteristics**

4        **A.    Defendant's Personal Characteristics**

5      The defendant is 35 years old and was 34 at the time of his crimes.  PSR at 2.  His frontal lobe is

6  fully developed.  He holds a Ph.D. from Northwestern University.  PSR ¶ 82. He some health issues, *see*

7  PSR ¶¶ 68–77, but none of them can explain his criminal conduct.  In stark contrast to many defendants

8  who come before the Court, he has never been addicted to drugs, PSR ¶¶ 79 –81, and was raised in a

9  "loving environment" by both parents.  PSR ¶ 60–61.

10        **B.    Defendant's Communications While in Pretrial Detention**

11      While in pretrial detention at the Santa Rita Jail, the defendant has engaged in voluminous

12  correspondence with several apparently like-minded individuals. The correspondence is too voluminous

13  to describe in detail here, but in general, it evinces a person who shows no remorse for his actions, seeks

14  to aggrandize himself, and seeks the assistance of others in spreading his message of political violence.

15  *See* Bhagat Decl. Ex. F (summary of certain correspondence).

16              **1.    *Self-Aggrandizement and Promotion of Political Violence***

17      The defendant's jail correspondence paints a picture of a narcissistic violent ideologue.  Goonan

18  refers to himself, proudly, as "[t]he only federal prisoner of the campus insurgencies in the entire

19  country."  Bhagat Decl. Ex. G at USA-0007628.  He admits to using his medical condition as a weapon,

20  bragging that he engaged in a hunger strike at Santa Rita and that his body was "a potentially dangerous

21  (in the good way) weapon as a hunger striker."  Bhagat Decl. Ex. H at USA-007504.  Following his

22  arrest, Goonan told a friend that he hoped that the prison movement and the student movement took up

23  the most creative militant tactics possible.  Bhagat Decl. Ex. F. at USA-008208.  "No more of this

24  pacifist transformative justice/community bullshit.  People are not learning enough from October 7th +

25  Palestine resistance tactics. People/students/anarchists in the Bay [*i.e.* Goonan himself] were testing

26  these methods @ UC Berkeley . . . Like the red triangle dot gopro videos of Pali resistance fighter

27  marking settler tanks in sneak attacks."  *Id.*

28

After reading a local news story about his prosecution, Goonan, who holds a liberal arts Ph.D., was annoyed and insulted that the newspaper called him an "academic:" "Anyway, I find it both annoying and insulting to be reductively characterized as an "academic" for several reasons that are worth detailing below."   Bhagat Decl. Ex. I at USA-0007261.   Goonan then spent 13 pages, paradoxically in an academic style, explaining that he was not an academic, but a "revolutionary abolitionist" who, for nearly a decade, had practiced "militant opposition." *See id.* at USA-007271.

In January 2025, Goonan wrote a friend, upset that an activist group wasn't appropriately recognizing him and his actions. He explained that the group had been compiling and publishing a list of all known arrestees from pro-Palestinian demonstrations, and that he had simply written them to explain that they had missed him and that he was "the only federal prisoner and facing the most severe charges of anyone on their lists." *See* Bhagat Decl. Ex. J at USA-007597.  "These pacifists," Goonan lamented, "could not understand how my acts were 'anti-war." *Id.* He complained that "this pacifism"—that is, peaceful protest—was "affecting the Palestine movement" and was an "obstacle impeding a revolutionary horizon." *Id.*

In the days leading up to his change of plea hearing, Goonan authored a poem about the hearing, sent it to several people and asked at least two of them to publish it.  *See* PSR ¶ 24; Bhagat Decl. Ex F. at USA-008209.  That poem attempted to justify his criminal actions and called upon others to join him: "In retaliation, I have set fires.  As invitation I ask will you join?  Or will patience persist as the unmerited virtue of today."  *Id.*

Goonan finds it "amusing" that "the federal building I attempted to burn down is the very courthouse that my hearings [h]ave been held at."  Bhagat Decl. Ex. N at USA-008059.   On January 15, 2025—the day after he pleaded guilty before this Court—Goonan mailed a drawing to an organization in Chicago.  The drawing depicts a burning American flag, a dark hand holding a Molotov cocktail with "1312," ("all cops are bastards") a UC Police Department vehicle alight and an Israeli Defense Forces tank, and the label "Anticolonial Direct Action," along with inverted red triangle—a universal symbol of Hamas.  On the reverse, Goonan wrote "FTP" – "Fuck the police."  *See* Bhagat Decl. Ex. K at USA-007679–USA-007680; PSR ¶ 24.  In a November 2024 letter, he included a drawing of a UCPD car on

1  fire, writing, "fire to the jails and prisons" and signing off, "Love, Casey."  Bhagat Decl. Ex. L at USA-

2  007522.

3        Goonan views himself—a person who takes violent action against institutions he sees as

4  hindering his political goals—as a doer, not a bystander, and criticizes news articles that "only uplift

5  pacifist [read: peaceful] forms of struggle," to achieve political goals, suggesting that he desires the

6  opposite:  violent forms of struggle.  *See* Bhagat Decl. Ex. M at USA-007293–USA-007294; PSR ¶ 30.

7  He criticizes those who have not commented on his own actions and similar criminal conduct: "There

8  are also places . . . with cop cars flipped and property destruction accompanying quick takeovers with no

9  arrest, yet no analysis is coming out about those, or link what occurred in Berkeley, with 'Operation

10  Campus Flood.'"  Bhagat Decl. Ex. M at USA-007294.

11        In another note to a friend, Goonan implored them not to "let anyone forget that more advanced

12  tactics"—his arsons and firebombings—"were tested in the Bay Area/UCB campus fight for Palestine

13  than simply pitching tents and hosting teachouts for weeks!"  Bhagat Decl. Ex. O at USA-007555.  He

14  then referred them to the blog posts about his crimes.  *Id.*  What Goonan's own operation lacked, he

15  lamented, "was more numbers of participants, lack of preparation, and not enough tact to use the finer

16  lessons of [Hamas's] Operation Al-Aqsa Flood."  *Id.* "For instance," Goonan continued, "in Op Al Aqsa

17  Flood, the counter-offensive attack began with <u>decoy</u> firing of missiles up the coast toward Tel Aviv—

18  focusing all Zionist attention <u>there</u>."  *Id.* at USA-007556.  The lessons to be drawn from the Hamas

19  attack that killed 1200 people, Goonan concluded, were to "use decoys, dismantle surveillance where

20  possible, don't leave traces, and try to take initiative to catalyze revolt not simply trail uprisings and

21  movements as they form without us." *Id.*

22        Goonan is not satisfied with his own actions; he wants to inspire followers.  He encourages

23  others to read his manifestos (what he calls "communiques").  *See. e.g.,* Bhagat Decl. Ex. G. at USA-

24  007627.  He believes that he is engaged in a war, *id.* at USA-007628, and he continually expresses

25  disgust with those who engaged in peaceful protest.  *See, e.g., id.* at USA-007633 ("I also however am

26  annoyed more generally with the hesitancy of nonstudent community support in college cities to simply

27  override student's [sic] planning and just take history into our own hands.  We can wait for them, and

28  trail these protests that in most areas are not actually escalating, or we can be the spark or catalyst (or

whatever metaphor you'd like to use) to heighten contradictions and set new levels of insurgency in motion." He derogatorily calls the activities of peaceful protesters "performative activism" and "partial solidarity." *Id.* at USA-007629.

In a September 2024 letter, Goonan called for "direct attacks on campus infrastructure" combined with the use of "communiques and statements" to communicate their political demands. *Id.* at USA-007633. In other words, he called for others to do what he did.

## 2.    Plans to Release Commentary After Sentencing

On several occasions, Goonan has told others that he plans to publish his real thoughts *after* this Court sentences him. After he was arrested, he wrote to a friend: "Not trying to force anything, I just don't have a safe way to preserve this stuff and at some point (once its 'safe' to), I'd like to circulate all this analysis publicly." Bhagat Decl. Ex. I. at USA-0007258 (emphasis added). On February 15, 2025 – after he pleaded guilty—he urgently asked a friend to transcribe his writings because "[o]n April 24, my birthday, I plan to share three of my writings from jail publicly on my blog." *See* Bhagat Decl. Ex. P at USA-007648. Goonan picked April 24 because it was symbolic—his birthday—but also because it was after his original sentencing date of April 8. *See* Minute Entry, ECF No. 24 (setting sentencing date for April 8, 2025). In another letter, he was more explicit: "My plan is to publish and begin circulating some selected letters and writing from my time at Santa Rita on April 17th, the day after my sentencing hearing, because at that point I'll be able to speak publicly again without consulting lawyers." Bhagat Decl. Ex. Q at USA-007656. On February 17, 2025, Goonan wrote: "Not sure how much you know about my case or situation at the moment but once I'm sentenced in April, I'm gonna be releasing some letters and writings that I wrote while in jail, reflecting on the encampment wave and Campus Flood @ UCB." Bhagat Decl. Ex. R at USA-007662. He warned others not to share his statements because he wanted to hide his true views from the Court: "P.S. Please do not circulate this online or publicly. It's okay to share among comrades but i can't make public statements until after my sentencing hearing on 4/8/25." *Id.* at USA-007671. *See also* Bhagat Decl. Ex. S at USA-008180 ("do not make this public, print or digital, until after my sentencing is over. Safe to say that 6/17, the anniversary of the day of the raid is a good day, or maybe 6/16…whichever").

Goonan has worked with others to create a book manuscript, which he intends to publish after sentencing. He has asked individuals to help, and they have transcribed and complied hundreds of pages for the effort. *See* Bhagat Decl. Ex. F at USA-008210–USA-0081211 (noting incoming mail that includes timeline of life and campus flood movements, and single additional mailing containing 230+ pages). Goonan has taken an active role in this project, as evidenced by his handwritten notes and his insistence that Goonan took pains to ensure that his attacks on Oakland and the entire East Bay were recognized—not just his conduct in Berkeley. *See* Bhagat Decl. Ex. S at USA-008185. The erstwhile outline and table of contents for that book suggests that it will include, among other things, his blog posts taking responsibility for the June 2024 attacks, a "prisoner of war" statement, an examination of the Al-Aqsa Flood as a paradigm of insurgency, an examination of the University Campus as a "Zone of Combat," "approaches to decentralized guerilla attack." *See* Bhagat Decl. Ex. T. In a letter dated November 20, 2024, Goonan shared a bibliography of his writings, including the forthcoming book on the criminal activity for which he is being sentenced. Bhagat Decl. Ex. U at USA-0007515. He implored the recipient: "Do not tell anyone else about this project yet…not even the lawyers . . . . I am waiting to see what happens with sentencing before I tell more people about this." *Id.* "Don't worry," he assured the recipient. "I'm going to release this after sentencing, when there is no way it can affect my case." *Id.* In a subsequent letter, he confirmed to a friend, "I'm putting together a book of it all [his analysis pieces] for release once it can't affect my sentencing." Bhagat Decl. Ex. F at USA-008210. Shortly after Goonan learned that the government was in possession of his correspondence, Goonan wrote to warn others, acknowledging that he had been reckless in expressing his true beliefs and expressing apprehension that the Court's knowledge about them might affect his sentence. *See* Bhagat Decl. Ex. V at USA-007654.

### 3. Escape Plans

In October 2024, the defendant attempted to send a letter to a person in Philadelphia. In that letter, he criticized those who did not endorse "combative direct action," Bhagat Decl. Ex. M at USA-007294. Goonan went on to describe, in detail, a plan to take advantage of his medical conditions to escape pretrial custody. *See id.* at USA-007295–USA-007296. He described it as a "comic strip," but the level of detail, along with the context (at one point, Goonan says he is "gonna leave it there for the

imagination"), tends to suggest that it was more of a plan than a comic strip and that Goonan was asking the recipient for assistance.   The jail took it seriously; of all of Goonan's correspondence that it intercepted during the course of his pretrial detention, this was the only one that it chose not to send to the recipient following a review.  Bhagat Decl. ¶15.

### 4.    Use of "Legal Mail" to Evade Detection

Like many detention facilities, the Alameda County Sheriff's Office has a special policy with regard to inmates' correspondence with lawyers, courts, and judges—as a general matter, the contents of such correspondence are not inspected. *See generally* Bhagat Decl. Ex. W at USA-008234. Goonan took advantage of this policy to evade detection.

### (i)    Correspondence with D.R.

For example, on July 28, 2024, Goonan sent correspondence to his friend and former professor, a person who has never practiced law, has no legal training, and does not work at a legal services provider.  *See* Bhagat Decl. Ex. X.  In that correspondence, Goonan explained that "on the topic of narrative warfare and documentary purposes, I want to give you an explanation of what and where my archives are.  I'm doing this for the purposes of preempting the erasure of my life's work, which is/has been largely not under my name."  *Id.*  at USA-007252.  What followed was largely instructions on how to find Goonan's writings, and a wish list. Even though the correspondence was not written to a lawyer and did not seek legal advice, Goonan wrote on the envelope, "Protected/Privileged Legal Correspondence" and "Legal Councel [sic] Confidential Legal Correspondence."  *See id.* at USA-007251.

On August 6, 2024, Goonan sent correspondence to the same person; that correspondence did not contain a single request for legal advice or a discussion of Goonan's legal issues.  Rather, it was a 13-page litany of Goonan's complaints, his criticism about "academicism," and how he resented "far-right asshats" and "Nazi-brain-programmed Right-wing dorks" that sought to explain his actions without respecting his autonomy.  Despite this, Goonan labeled the correspondence "Legal Mail Protected Correspondence Legal Council [sic]."  Bhagat Decl. Ex. I at USA-007256.

1

2

       **(ii)    Correspondence with R.A. and Goonan's Requests to Others to Fraudulently Send Him Activist Material Under the Cover of Legal Mail[2]**

3        R.A. is a friend of Goonan's who works at a legal-services organization.  Goonan has engaged in

4 substantial communication with R.A. by labeling that correspondence as "legal mail" and "privileged

5 correspondence" and addressing it, in almost every case, to a lawyer who worked at the organization,

6 complete with the attorney's bar number.  Yet, the correspondence was overwhelmingly of a personal

7 nature.  *See, e.g*.Bhagat Decl. ¶ 27 & Ex. Y at  USA-008217 (July 24, 2024); USA-008219 (Aug, 23,

8 2024); USA-007636 (Oct. 30, 2024).  And the lawyer never authorized R.A. to engage in

9 correspondence using the lawyer's name or bar number; the lawyer has never met or represented

10 Goonan.  *See* Bhagat Decl. Ex. Z.

11        Moreover, there is substantial evidence that Goonan planned to use his relationship with R.A.—

12 and that person's employment at a legal-services organization—to facilitate the receipt of information

13 that he did not want jail authorities to see.  In a September 2, 2024 phone call, Goonan thanked R.A. for

14 "all the legal mail" that he had been "sharing[] around." Bhagat Decl. Ex. W at USA-008226.  In an

15 October 31, 2024 phone call, Goonan used coded language when speaking to a friend who he had tasked

16 with transcribing his jail writings. He described a process whereby the friend could send him

17 transcriptions via legal mail, "he would make edits and send them back to her, she would get them to

18 'the homies' . . . and she would then resend the book to him [Goonan] via legal mail."  Goonan told the

19 other party that this plan—to transcribe his jail correspondence and publish a book—was "'under wraps'

20 and that neither his defense committee nor his lawyers needed to know about it." *Id.* at USA-008255.

21 Goonan then went on to explain what he meant by legal mail: "Send it to me through legal mail, I'll

22 show you a person to do it through—I have a person who can do that—I have a friend who is a lawyer

23 and can do that.  I'll connect you with them eventually." *Id.* at USA-008256.

24

25       [2] The probation officer's decision to omit this information from the PSR because "these

26 communications are the subject of litigation before a United States Magistrate Judge," PSR addendum at 1, is misguided. The discrete issue before the Magistrate Judge is the government's request that the Magistrate Judge provide the government with unredacted versions of three of the letters in question,

27 which were obtained via search warrant; the defendant claims that the redacted portions are privileged. Regardless of the Court's ultimate resolution on that discrete issue, it is undisputed that Goonan engaged

28 in this correspondence and at least part of that correspondence was personal in nature. *See, e.g.*, ECF Nos. 36, 52, 53, 55, 56.

GOVERNMENT'S SENTENCING MEMORANDUM
CR 24-414 JSW               17

On December 5, 2024, Goonan wrote the same person with whom he communicated on October 31 and told her that when she completed her transcriptions, she should "write a short note, telling the recipient that you are trying to get my book manuscript draft to me safely and securely. They will know what to do . . . Let them know the timing is urgent." Bhagat Decl. Ex. AA at USA-007538. Goonan then instructed the person to send the transcription to the lawyer, complete with the lawyer's bar number. *See id.* USA-007539. On November 1, 2024, Goonan wrote to a friend: "I'm receiving a substantial amount of mail from all over the country, who are sending zines, articles, excerpts, and books that my lawyers would consider 'highly sensitive'… Would still like to find a way (maybe via 'Legal Mail'— my friend w/ the [legal services organization] could help w/ that) to get ahold of some of the more prominent or impactful articles, briefs, and content from the counter-info ecosystem published since June, til present." Bhagat Decl. Ex. W at USA-008256. In the same letter, Goonan told the recipient to send "all Print Outs or info to" the lawyer, "for Casey." *Id.* at USA-008256.

### C.    Defendant's Criminal History and Conduct While in Custody

The defendant does not have any prior convictions. But that does not mean that he has never previously engaged in criminal conduct. In September 2023, he attended a protest near the Hilton hotel in San Francisco. But rather than peacefully express his views, Goonan took it upon himself to climb the Hilton sign and attack it with a hammer, causing thousands of dollars in damage. And when police officers attempted to stop him, he fled. Two officers suffered injuries in the pursuit, including one who fractured a finger. *See* PSR ¶ 55. He was charged with vandalism and resisting a peace officer causing serious bodily injury. And on a random day in June 2024, while agents were conducting surveillance on Goonan, they saw him vandalize a real estate sign in Oakland, unprovoked and for no apparent reason. PSR ¶ 23.

In July 2024, while in custody at the San Francisco County Jail, Goonan banged a telephone against a wall several times, ignoring orders to stop and eventually causing it to break. He was charged with causing damage in a jail. PSR ¶ 56. Goonan's time in federal pretrial custody, too, has not been without incident. In May 2025, he submitted a grievance against a jail deputy, alleging that the deputy had threatened him and engaged in a pattern of aggressive behavior. Santa Rita, which remains under federal monitorship, takes allegations like that very seriously. It conducted a full investigation and

concluded that not only were Goonan's allegations without merit, but that he had made them in bad faith. PSR ¶ 33. And even while still under sanction for this bad faith conduct, in June, he suffered an additional disciplinary infraction for disrespecting a deputy and causing excessive noise. *Id.*

### D. Defendant's Years-Long Advocacy for Political Violence

As set forth above, the defendant is a self-described anarchist. He has publicly claimed responsibility for the June 2024 attacks and claimed that they were in solidarity with the Palestinian people and their plight during the Israel-Hamas war. But Goonan had aims of political violence long before Hamas's attack on Israel and the ensuing conflict. In 2020, Goonan called on others to, among other things, loot businesses, throw rocks, steal crops, and "shoot cops." PSR ¶ 25. He posted diagrams on the Internet that described how to make Molotov cocktails. *Id.* Goonan, who at the time was a Ph.D. student at Northwestern, also endorsed the following: "Gas is cheap. Matches are free. School sucks." *Id.* To believe that Goonan's actions in the summer of 2024 that brought him before this Court are the sole result of some sincere-but-misguided attempt to aid an oppressed people is wrong. He has contemplated political violence (and the use of Molotov cocktails) in other contexts, and long before Hamas's 2023 attack on Israel.

## V. General Deterrence

General deterrence is a particularly important sentencing factor in a case like this, perhaps even more so at this moment in history. "A conviction and resulting sentence serves more purposes than the incapacitation, specific deterrence, and rehabilitation of an individual; general deterrence of the serious crime at issue here is also an important consideration." *United States v. Onuoha*, 820 F.3d 1049, 1056 (9th Cir. 2016). Political violence is endemic. Less than a week ago, a young political activist was murdered on a college campus. This summer, an assassin killed a Minnesota state lawmaker and her husband and wounded a state senator, each in their respective homes. On April 13, 2025, an assailant threw Molotov cocktails at the Pennsylvania governor's mansion while the governor and his family slept inside. In December 2024, the Chief Executive Officer of a major American health insurance company was gunned down in midtown Manhattan. In July 2024, within weeks of Goonan's arrest, a major U.S. presidential candidate was the subject of an assassination attempt during a political rally. Nor is this District a stranger to such horrors: in 2022, a man broke into the home of the former Speaker of the

House in San Francisco, intending to kidnap her, but instead brutally assaulting her spouse.  *See United States v. Depape*, Case No. 3:22-CR-426-JSC.  And in the summer of 2020, an extremist with grievances against the government opened fire on the Oakland federal building, killing one Protective Security Officer and wounding another.  *See United States v. Carillo*, Case No. 4:20-CR-265-YGR.

Goonan's actions were the height of political violence.  He engaged in a weeks-long reign of terror to bring attention to himself and his cause.  After each attack, he called upon others to join him (and continues to do so, even after his arrest and guilty plea).  The fact that his attacks did not hurt anyone is the result of serendipity, not design.  The demands of general deterrence are especially high here, where the crime is not just the destruction of particular property at a particular moment but is in fact a challenge to the rich traditions of peaceful political protest—on college campuses and elsewhere—that undergird our democracy.  Individuals who Goonan seeks to inspire by his actions—those who he seeks to have consider him a political prisoner and a "martyr"—must know that following in his footsteps will lead to a lengthy term of imprisonment.  "Terrorist activities such as those revealed in this case, even when bombs do not explode, wreak great havoc.  They disturb the peace and tranquility of all our citizens, requiring future security measures that are both costly and hobbling to the free spirit of our open democratic society."  *United States v. El-Jassem*, 819 F.Supp.166, 180 (E.D.N.Y. 1992).  "General deterrence is essential here so that the severe consequences of choosing terrorism are apparent to all who might consider it."  *United States v. Babafemi*, No. 13-cr-0109, 2021 WL 1210313, at *6 (E.D.N.Y. Mar. 31, 2021).   The Court's sentence must be sufficiently severe to deter others from following in Goonan's footsteps.

## VI.    Specific Deterrence

The defendant has shown no remorse for his crimes.  In a missive to a friend, he wrote, "Mostly, I'm focused on not stirring up too much chaos while my charges keep getting worse. Once we succeed in getting the 'terrorism' enhancements dropped it'll be a little easier to turn up again."  Bhagat Decl. Ex. H at USA-007505.  Goonan's actions were political by design; his posting of a manifesto after each attack was calculated both to glorify his actions and to recruit additional co-conspirators.  He plans to publish a book, and views himself as a "martyr" and a political prisoner.  He rejects America's long

traditions of peaceful protest and deeply believes that violence is the only answer to achieving his political objectives.  Moreover, he is highly educated and a prolific writer; he intends to use those attributes to encourage others, too, to engage in violence to achieve their (and his) ends. And unlike others in his stead who simply inspire others to engage in terrorist acts or fund them, Goonan engaged in those acts himself.  He is dangerous.  But he is also a smart, rational actor. Any sentence this Court imposes must be severe enough to convince Goonan that committing similar acts after his release from custody is simply not worth the consequences.

**VII.    The Need for the Sentence to Protect the Public from Further Crimes of the Defendant**

As described above, the defendant is not sorry for his crimes; he is proud of them.  More so than other defendants, there is a substantial risk that he will seek to continue his efforts when released from custody.  Protection of the public requires a substantial term of imprisonment followed by an intensive term of supervised release.  The government joins probation in its recommendation of a 15-year term, along with special conditions that are tailored to the defendant's conduct in this case.  Those conditions include specific conditions restricting the defendant's computer use and his use of anonymizing services, as well as conditions requiring him to register as an arson offender.

As described above, the defendant has engaged in an unusually large amount of correspondence while in pretrial custody.  Much of that correspondence is about his use of violence to achieve political ends, and his call to others to join that cause. He has also attempted to take advantage of the restrictions on review of attorney-client material to shield his communications from authorities and law enforcement.  At certain institutions, the Bureau of Prisons operates "Communication Management Units" (CMUs).  CMUs are not solitary confinement, but rather general population housing units where inmates "ordinarily reside, eat, and participate in all educational, recreational, religious, visiting, unit management, and work programming."  28 C.F.R. § 540.200(b).  The CMU's purpose is to provide an environment that "enables staff to more effectively monitor communication between inmates in CMUs and persons in the community."  *Id.* § 540.200(c).  That may include certain limitations on written and telephone correspondence.  *See id.* Given the defendant's conduct while in pretrial custody, assignment to a CMU is appropriate.  Like other detention decisions, Goonan's designation is committed to the Bureau of Prisons, but the Court may include such a recommendation in its judgment.  The government

respectfully requests that the Court do so.

**VIII.  Conclusion**

Casey Goonan is not being prosecuted for expressing his political beliefs.  He was not convicted for holding those beliefs.  He chose to commit violence in furtherance of those beliefs—not once, not twice, but at least four times.  That, the law does not permit, and the Court should hold him accountable for those actions.

For the foregoing reasons, the United States respectfully requests that the Court impose a sentence of 188 months in custody, 15 years of supervised release, a $100 special assessment, and restitution and forfeiture.

Dated: September 16, 2025                              Respectfully submitted,

                                                       CRAIG H. MISSAKIAN
                                                       United States Attorney

                                                       */s/ Nikhil Bhagat*
                                                       NIKHIL BHAGAT
                                                       Assistant United States Attorney