1   SARAH POTTER, (CA SBN 280478)
    LAW OFFICE OF SARAH POTTER
2   214 Duboce Avenue
    San Francisco, CA 94103
3   t. (415) 423-3447
    sarah@sarahpotterlaw.com
4
    Attorney for Defendant GOONAN
5
                    IN THE UNITED STATES DISTRICT COURT
6
                FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
                            OAKLAND DIVISION
8

9   UNITED STATES OF AMERICA,              Case No.: 24-CR-00414 JSW

10                    Plaintiff,

11  vs.                                    SENTENCING MEMORANDUM

12  CASEY ROBERT GOONAN,

13                    Defendant

14  I.      INTRODUCTION

15          This case presents a true sentencing challenge for the Court, and the Court should

16  consider a more significant variance than the sentence recommended by probation and the

17  government.  For the reasons explained below, a just sentence for Casey Goonan is 96 months

18  followed by a meaningful period of supervised release.  Mr. Goonan has no prior convictions.

19  Any sentence will be a significant sentence for Mr. Goonan.  If the Court is inclined to increase

20  the amount of time Mr. Goonan is subject to the Court's supervision, he respectfully requests

21  that additional time be added to the period of supervised release and not to the prison sentence.

22  Mr. Goonan's type 1 diabetes will make the impact of a long custodial sentence much more

23  severe than it would be for a person of good health, and Mr. Goonan will be much better able to

    SENTENCING MEMORANDUM - 1

1   manage his condition while on supervised release.  The period of supervision will also allow Mr.

2   Goonan's mental health to be more effectively treated and monitored to ensure medication

3   compliance to eliminate any risk of future harm.

4   **II.    SENTENCING BACKGROUND**

5          Thirty-five-year-old Casey Goonan appears before this Court for sentencing following his

6   conviction for one count of Damage and Destruction of Property by Fire/Explosive (Interstate

7   Commerce) in violation of 18 U.S.C. § 844(i) (Count Two).  The Presentence Report (PSR) was

8   prepared by United States Probation Officer Pepper Friesen, and she has calculated his Criminal

9   History Category (CHC) at I, based on zero Criminal History points.  But due to the victim

10  related adjustment under USSG § 3A1.4(b), Mr. Goonan's CHC is automatically increased to VI.

11  Mr. Goonan's base offense level is 24, with 3 points deducted for acceptance of responsibility,

12  and 12 points added for the victim-related adjustment under USSG § 3A1.4(a), resulting in a

13  Total Offense Level (TOL) of 33.  The statutory provisions call for a sentence between 5 years

14  and 20 years, with a guideline range of 235–240 months.  If Mr. Goonan were not subject to the

15  victim adjustment under USSG § 3A1.4, his guideline range would be 37-46 months.  Probation

16  has recommended a variance to 180 months followed by 15 years of supervised release.  The

17  government is also expected to recommend a variance.  The recommendation for a variance is

18  fair and appropriate.

19  **III.    PERSONAL HISTORY**

20         Casey Goonan was raised in Concord and Pleasant Hill, California.  He had a loving

21  home environment and family support.  His mother Julie is an illustrator, and his father Michael

22  is a construction superintendent.  He has a younger brother, Thomas, who he is close with.  As a

23  child, he distinguished himself as an exceptional athlete, going on to win a sectional

championship in baseball his senior year of high school.  He continued to play baseball in college until an injury forced him to stop playing.

      After the injury, Mr. Goonan began to focus more directly on academics and transferred to UC Riverside where he ultimately earned his B.A. in Ethnic Studies.  During this time, Mr. Goonan became engaged in human rights and social justice.  He developed strong beliefs about the responsibility of U.S. citizens to stand up against government policies and resources contributing to conflict abroad, particularly the situation facing Palestinians.  Shortly after graduating from UC Riverside, Mr. Goonan was accepted on a full scholarship to Northwestern University where he earned a Ph.D. in African American Studies.  Throughout his time in college and graduate school, Mr. Goonan established himself as a respected academic and community leader, devoting himself to relieving harm in the world and bettering conditions for others less fortunate than himself.

      While working on his Ph.D., Mr. Goonan was hospitalized with pneumonia and was subsequently diagnosed with type I diabetes.  Mr. Goonan's health struggles took an incredible toll on him, particularly because he had always been a strong athlete.  Type 1 diabetes is difficult to manage even under the best circumstances.  ████████████████████████████ ██████████████████████████████████████████.  Added to this was the stress and isolation of the COVID-19 pandemic, which posed a higher risk for someone like Mr. Goonan who was living with type 1 diabetes.

      Over time, Mr. Goonan's mental health began to decline.  In 2017, he was diagnosed with anxiety and OCD and eventually his doctors began to suspect that he may have bipolar disorder due to what appeared to be symptoms of mania.  Mr. Goonan received various treatments for his mental health while in graduate school, but as with many psychiatric

SENTENCING MEMORANDUM - 3

1    medications, struggled to find the right combination to address all his symptoms.  There were

2    moments when Mr. Goonan was not sure whether he would be able to complete his Ph.D. given

3    his mental state.  But he persevered and eventually completed his dissertation.

4        After receiving his Ph.D., Mr. Goonan put his energy into prisoner support and letter

5    writing, unhoused outreach, volunteering at a library, and working as a community teacher for

6    adults with disabilities at Ala Costa Center in the East Bay.  It was then that things started to

7    profoundly unravel for Mr. Goonan.

8        Mr. Goonan was arrested in September 2023 after hitting a Hilton Hotel sign with a

9    hammer during a protest in San Francisco.  Shortly after, he was "doxed" and his personal

10   information, including his address, was shared on right wing extremist sites.  Mr. Goonan feared

11   for his safety and withdrew from his work and volunteer activities.  Around this time, the conflict

12   between Palestine and Israel escalated.  Mr. Goonan became frantic about standing in solidarity

13   with the Palestinian people and protesting the United States' involvement in continuing the

14   ongoing genocide.  Mr. Goonan devoted all his time and energy to activism, at the expense of his

15   physical and mental health.  He was not sleeping, he was not taking his psychiatric medication,

16   and he was not taking care of his physical health, including maintaining his blood sugar levels

17   with insulin.  He spent weeks living on the streets in the UC Berkeley encampment and believed

18   that he needed to stay awake and vigilant at all times to protect marginalized individuals in the

19   encampment from harm.

20       After about three weeks on the streets, Mr. Goonan developed a rash on his arms and legs

21   and sought care at the hospital.  He went to four separate hospitals seeking treatment and

22   received medication including an insulin prescription.  On May 15, 2024, Mr. Goonan went to

23   Contra Costa Medical Center for the rash on his arms and legs.  The medical records demonstrate

SENTENCING MEMORANDUM - 4

his unstable mental state.  He reported that no other facility would treat him, but medical chart notes from the other facilities indicated that Mr. Goonan had been previously seen and treated. In the emergency department, Mr. Goonan began yelling that the staff was not listening to him and that they were white supremacists and fascists.  Mr. Goonan reported that he was paranoid about people he loves being hurt and felt that he was always being monitored and recorded.  He was subsequently sedated and placed on a 5150 hold for psychosis and transferred to St. Helena Behavioral Health.  He was formally diagnosed with bipolar disorder, marijuana use disorder, and obsessive-compulsive disorder.

Three days after being admitted, Mr. Goonan left against medical advice.  Mr. Goonan was prescribed medication to treat his bipolar disorder but after leaving the hospital, discontinued it.  Mr. Goonan then left on a planned two-week trip to Chicago to visit friends. When he arrived, however, he found himself feeling isolated and disconnected from his community.  He slept on the street in the rain and returned home after less than a week.  This trip exacerbated Mr. Goonan's already fragile mental health struggles.

When he returned home, Mr. Goonan attempted to return to his parents' home but they had guests staying in his room.  By this point, Mr. Goonan was in a full mental health crisis.  The UCPD incident happened less than 24 hours later, while Mr. Goonan was unmedicated, manic, and unhoused.  The other incidents followed shortly after.

Mr. Goonan went from a star athlete whose identity was wrapped up in his physical abilities to losing that identity to an injury.  He then began to reinvent himself as a scholar activist and was experiencing great success in his academic field when his body betrayed him again with a type 1 diabetes diagnosis.  The physical and mental toll this took on him put him back on his heels yet again as he tried to readjust and reimagine what his future may look like.

After finally overcoming his struggles to finish graduate school, Mr. Goonan expected to transition easily into teaching but instead found himself unable to pay his bills, transient, and becoming increasingly paranoid and agitated.  Mr. Goonan's physical and mental stability markedly deteriorated in the months before the offense, during which he became increasingly fixated on the United States' complicity in the genocide in Gaza— a sequence of decline and radicalization that, while not excusing his actions, materially mitigates the appropriate measure of punishment.

## IV.    COMMUNITY SUPPORT

Family members, friends, colleagues, and neighbors consistently describe Mr. Goonan as a person of exceptional character who is generous, helpful, and cares deeply for others.  See Exhibit A.  Mr. Goonan devoted himself to caring for and giving a voice to the most marginalized members of society, using his privilege and education to make a difference in areas that were often neglected by others.  He is described as a "pillar of support for so many who would otherwise be 'overlooked.'"

For example, at the height of the pandemic, when Mr. Goonan and a friend started a mutual aid and food distribution project for poor and unhoused minorities, including immigrants and refugees facing the brunt of job losses, unaffordable healthcare, and inadequate housing. Mr. Goonan would stand out in the cold—day after day—offering supplies, food, and other help to anyone in need.  In another instance, Mr. Goonan engaged in fundraising and support efforts for elderly and disabled prisoners in the United States, focusing on those who were poor and socially isolated without networks for support.  Mr. Goonan's prisoner outreach efforts through letter writing and other support initiatives began during his time in college and continued until the time of his arrest.

Unfortunately, those close to him also note that he tended to devote himself fully to his community at the expense of his own physical and mental well-being. After his type 1 diabetes diagnosis and subsequent mental health decline, this neglect of self-care began to have profound consequences. What Mr. Goonan viewed as another instance of devoting himself fully to supporting a people facing oppression, in this case Palestinians, ultimately led to a severe mental health break and behavior that is not in line with Mr. Goonan's underlying character.

Another common theme in the letters of support is how much Mr. Goonan can positively contribute to society in the future with proper mental and physical health support. Mr. Goonan is a celebrated academic with much to give to the world. His ability to unite groups in service to others is something that is not often found in people. While Mr. Goonan will find ways to help others wherever he is, he will make a bigger impact from outside the walls of a prison.

Mr. Goonan is fortunate to have the support of a wide community of academics, friends, and family who are all eager and willing to support him through his recovery and reentry into society as a responsible, peaceful, and constructive community member. This support network includes not only his parents, brother, aunts and uncles but also a professor at Carnegie Mellon University, an attorney and community advocate based in Chicago, a professor at University of Virginia, a Ph.D. candidate at Columbia University, a distinguished professor at UC Riverside, a professor at Sacramento State University, a Ph.D. candidate at the University of Michigan, a Professor at Compton Community College, and many other members of the broader community. It is not often that we see criminal defendants with as wide a support network as Mr. Goonan has, and it speaks to the social foundation he will have upon release.

SENTENCING MEMORANDUM - 7

1    **V.    PHYSICAL AND MENTAL HEALTH STRUGGLES**

2        While in jail, Mr. Goonan has continued to struggle with stabilizing his physical and

3    mental health.  Upon learning that the case would be taken over by the federal government,

4    Alameda County dismissed the charges against him and Mr. Goonan was briefly transferred to

5    San Francisco on a bench warrant for his case there.  During this transfer period, Mr. Goonan

6    was not receiving appropriate medical care and his blood sugar was not properly controlled.

7    Frustrated that he was being refused medical care despite his pleas with staff, he damaged a

8    phone in the San Francisco County jail.  During this time, Mr. Goonan was still in a manic state.

9    Mr. Goonan was then transferred back to Santa Rita jail and was immediately hospitalized due to

10   his dangerous blood sugar levels.  At the time his blood glucose level was 468.  This is more

11   than four times what is considered a "normal" blood glucose level and is high even for someone

12   with type 1 diabetes.  Mr. Goonan was hospitalized a second time approximately 3 months later

13   with a blood glucose level in the 300s.

14       Mr. Goonan's type 1 diabetes will continue to pose a challenge for him in custody.  As

15   stated in a leading study on diabetes management for incarcerated persons:

16           People in correctional facilities have limited food choices,
             restricted autonomy, tightly controlled physical activity ,and
17           a lack of control over medications.  These individuals often
             return to their communities with underlying physical and
18           psychiatric co-morbidities, which may have been under-
             treated or mismanaged during incarceration.
19
20   Dhaliwal KK, Johnson NG, Lorenzetti DL, Campbell DJT. Diabetes in the context of

21   incarceration: A scoping review. EClinicalMedicine. 2022 Dec 13;55:101769. doi:

22   10.1016/j.eclinm.2022.101769. PMID: 36531980; PMCID: PMC9755063; accessed at

23   https://pmc.ncbi.nlm.nih.gov/articles/PMC9755063/.

SENTENCING MEMORANDUM - 8

Type 1 diabetes is a lifelong condition that is much harder to manage than type 2 diabetes. The easiest way to control blood sugar is through a specific and controlled diet, which is not achievable in a carceral setting. Mr. Goonan must rely on both long acting and short acting insulin to manage his blood sugar levels, but it is not a perfect science and he often finds himself imbalanced in one direction or another. He has not been allowed to utilize a continuous glucose monitor or other methods of monitoring his glucose levels that would allow him to keep a close eye on his body's needs. The health impact of a long custodial sentence on Mr. Goonan will be profound given this underlying condition. He is immunocompromised, making him more susceptible to infection and illness, and uncontrolled blood sugar takes an irreversible toll on many systems in the body.

Even in the year that Mr. Goonan has been in custody in Santa Rita Jail he has developed numerous infections in his feet and legs. Initially, he believed that the discomfort he was experiencing in his legs was a side effect of the psychiatric medication he had been prescribed shortly before, so the medication was discontinued. The infections caused Mr. Goonan extreme pain and he was moved to the infirmary for extended treatment on more than one occasion. Mr. Goonan also suffers from neuropathy and has begun to lose some feeling in his toes.

For a significant portion of the time he has been in custody, Mr. Goonan was taking no psychiatric medication. It was not until about March 2025 that Mr. Goonan began consistently taking Prozac to manage some of his mental health symptoms. While he has seen some improvement and is committed to treatment, he continues to experience periods of mania.

Dr. Jeff Gould evaluated Mr. Goonan recently and concurs in the diagnoses that were made at St. Helena Behavioral Health when Mr. Goonan was held on a 5150 hold. See Exhibit B. In Dr. Gould's opinion, Mr. Goonan's bipolar disorder was a contributing factor in Mr.

SENTENCING MEMORANDUM - 9

Goonan's actions in this case.  Manic episodes are characterized by "persistently elevated, expansive or irritable mood" accompanied by at least three additional symptoms from a list that includes "inflated self-esteem or grandiosity, decreased need for sleep, pressure of speech, flight of ideas, distractibility, increasing involvement in goal-directed activities or agitation, and excessive involvement in activities with a high potential for painful consequences."  Some individuals also experience psychotic symptoms such as "delusions, hallucinations, and disorganized speech or behavior."  Regarding Mr. Goonan, this behavior was "distinctly different" than any previously observed behaviors prior to the onset of his mental illness.  As Dr. Gould notes, "[w]hile his behavior has been shaped in part by political and moral convictions, both prior to and subsequent to his symptom episodes, there is also evidence of psychiatric symptoms influencing his judgment, behavior, impulse control, and functional capacity."

Dr. Gould also notes that Mr. Goonan is still not receiving proper treatment for bipolar disorder and should be taking an antipsychotic or mood stabilizer in addition to the Prozac.  Mr. Goonan is willing to adjust his medication to properly address his needs and hopes to receive better medical and psychiatric care in the Bureau of Prisons.  Once the appropriate combination of medications has been found, Mr. Goonan is willing to agree to medication injections to ensure compliance and reassure the Court that he remains stable and avoids the mental states that contributed to his criminal actions.

## VI.    MR. GOONAN'S POLITICAL BELIEFS

While in custody, Mr. Goonan has continued to communicate with friends via letters and phone calls, at times expressing views that some find controversial.  The government claims these letters show that Mr. Goonan is unremorseful for his actions and "intends to continue

SENTENCING MEMORANDUM - 10

supporting his cause," implying that he will engage in violent actions again in the future.  But the government's characterization is inaccurate.

As an initial matter, it is easy for some of the terminology used in Mr. Goonan's writings to be misconstrued if the definitional context is not clear.  To assist the Court in making an accurate assessment of Mr. Goonan's communications, the following definitions are important:

1.  Escalate – a common term used in social movement strategic discussions to indicate a diverse variety of tactics intended to 1) attract greater public attention to a cause; 2) inspire greater and more widespread participation in the movement from an empathetic public; and 3) create greater pressure on powerful institutions.

2.  Anarchist – A political philosophy that conceptualizes human community and social reproduction without the need of a state authority or other hierarchical institution.

3.  Abolitionist – A person, community, or organization that thinks and works within a tradition of African diaspora liberation movement that seeks complete freedom from all forms of captivity, including incarceration.  In contemporary terms, this includes a political and cultural philosophy of creating a society that does not include human captivity or state policing as part of its infrastructure.

4.  Militant – Describes a person, organization, or social movement that is consistently and openly committed to specific principles and objectives.  Militancy is essentially a state of mind, individually or collectively.

5.  Resistance – Forms of individual or collective activity that attempt to mitigate, avoid, or eliminate oppressive forms of power.  Resistance is a response to oppression.

6.  Combative Direct Action – Refers to a strategy of engagement with a dominant institution of power that involves some form of physical confrontation.  Combative direct

1    action can include a broad spectrum of actions, including nonviolent disruption, property

2    destruction, hand-to-hand combat, etc.

3        As Mr. Goonan explains in his statement, it is true that he is still firmly against the

4    genocide in Gaza.  See Exhibit C.  He still supports peaceful activism and direct action to

5    effectuate change across the country.  He continues to be vocal about his disagreement with the

6    United States offering military support to Israel and his support of those who are speaking up

7    about it.  These beliefs are protected under the First Amendment.

8        So too are Mr. Goonan's statements in his letters, which are expressions of protected

9    political speech .  Although the government or this Court may find statements like "all cops are

10   bastards" to be offensive, an "expression of disapproval toward a police officer . . . f[alls]

11   squarely within the protective umbrella of the First Amendment and any action to punish or deter

12   such speech . . . is categorically prohibited by the Constitution."  *Velazquez v. City of Long*

13   *Beach*, 793 F.3d 1010, 1020 (9th Cir. 2015) (quoting *Duran v. City of Douglas, Ariz.*, 904 F.2d

14   1372, 1374 (9th Cir. 1990)).  None of Mr. Goonan's letters express true threats, fighting words,

15   or incitement to "imminent lawless action."  Instead, Mr. Goonan has a right to express his

16   displeasure with the government and law enforcement, and those protected expressions cannot be

17   a basis for punishment.

18       As to the way Mr. Goonan has chosen to express himself under the circumstances, it is

19   significant that Mr. Goonan has also been continuing to suffer from mania and uncontrolled

20   blood sugar while in custody.  This instability in his mental and physical health often leads him

21   to express himself in more impulsive and antagonistic ways, something that can be easily

22   addressed with a consistent medication regimen.

23

SENTENCING MEMORANDUM - 12

Mr. Goonan's demonstration of his character over the preceding 33 years before his drastic mental health decline shows that he is committed to standing up for marginalized communities and dissenting to government action without resorting to violence or destruction. When Mr. Goonan returned from graduate school, ███████████████████████, a devastating health event, and subsequently sliding into serious mental health struggles, that unfortunately changed.  With some stability in his physical health and the beginnings of stability in his mental health, Mr. Goonan recognizes that he took things too far.  He has always worked to protect people from violence and never intended his actions to put others in danger, though he can see now how he did.  In his mind at the time, he was taking precautions to make sure nobody was around and that he would only cause property damage.  With a clearer head, he can see how his actions put many people in danger, and he deeply regrets that.

"[N]o person can or should be punished based solely on his 'abstract beliefs' or political ideology."  *United States v. Gunby*, No. CR 21-0626 (PLF), 2023 WL 7156520, at *1 (D.D.C Oct. 31, 2023 (quoting *Dawson v. Delaware*, 503 U.S. 159, 167 (1992); *see also American Communications Ass'n, C.I.O. v. Douds* 339 U.S. 382, 452 (1950) (Black, J., dissenting) (a "basic constitutional precept [is] that penalties should be imposed only for a person's own conduct, not for his beliefs").  The basis for Mr. Goonan's sentence must be his actions, not his political beliefs.  Increasing his sentence because he expresses political opinions and beliefs that some disagree with would violate core principle of the First Amendment and criminal jurisprudence.

## VII.    RECOMMENDED SENTENCE

Based on the 18 U.S.C. § 3553(a) factors, in particular the fact that Mr. Goonan was suffering from a mental health crisis at the time of the actions, the health consequences of a long

SENTENCING MEMORANDUM - 13

1   custodial sentence, and the ability to mitigate future harm with proper treatment and medication,

2   Mr. Goonan respectfully requests that the Court sentence him to a term no greater than 96

3   months in custody followed by a period of supervised release.  The period of supervision will

4   allow the Court to ensure proper medication compliance and supervise Mr. Goonan as he

5   resumes his work in the community.  Mr. Goonan acknowledges that this request is significantly

6   lower than probation or the government are recommending but knows that this period is more

7   than sufficient to ensure that nothing like this ever happens again.

8   **VIII.   SPECIAL CONDITIONS OF SUPERVISED RELEASE**

9           Pursuant to 18 U.S.C. § 3583(d), a district court has discretion to impose special

10  conditions of supervised release, so long as the conditions: are reasonably related to the goals of

11  deterrence, protection of the public, or rehabilitation of the offender; involve no greater

12  deprivation of liberty than necessary to achieve those goals; and are consistent with any pertinent

13  policy statements issued by the Sentencing Commission.  *See United States v. Weber,* 451 F.3d

14  552, 557-58 (9th Cir. 2006).  The government bears the burden of proving that a particular

15  condition of supervised release involves no greater deprivation of liberty than is reasonably

16  necessary to serve the goals of supervised release.  *Id.* at 559.

17          The proposed restriction on Mr. Goonan's electronic device possession and usage bears

18  no relation to protecting the public from acts of arson, promotion of rehabilitation, or preventing

19  recidivism.  Mr. Goonan's posts on blogs and social media were not criminal in and of

20  themselves.  Mr. Goonan's crimes were not made possible due to his use of electronic devices.

21  All the posts were made after the crime was completed and did not call for or incite any specific

22  actions by others.  Therefore, Mr. Goonan objects to the inclusion of special conditions of

23  supervision One, Two, and Three because they would result in a greater deprivation of liberty

SENTENCING MEMORANDUM - 14

than is reasonably necessary.  "[A] mere nexus between the crime and a computer" does not justify the sweeping conditions proposed in the PSR and such conditions have been routinely struck down by courts.  *United States v. Barsumyan,* 517 F.3d 1154, 1161 (9th Cir. 2008).

Mr. Goonan further objects to special condition Four, which bans the possession or use of "any data encryption technique or program."  Courts have held that "software on any computer connected to the Internet changes constantly" and "routine or automatic software additions, deletions, upgrades, installations, repairs, or other modifications" make blanket bans on any use of encryption "unworkable and overbroad."  *United States v. Goddard,* 537 F.3d 1087, 1090-1091 (9th Cir. 2008).

## IX.    CONCLUSION

Mr. Goonan recognizes that when he is unmedicated and untreated, his judgment is distorted, his short-term assessment of risk and repercussions is impaired, and that his deterioration of health was a direct cause of his actions.  This is not a place that Mr. Goonan ever wants to return to, especially now, understanding the very real consequences that flow from his actions.  Mr. Goonan has spent most his life as a conscientious member of the community and has the support in place to successfully reintegrate into society when he is released.  Accordingly, Mr. Goonan asks that the Court sentence him to no more than 96 months in custody.


Dated: September 16, 2025                          Respectfully submitted,


                                                                    /s/
                                                   _____
                                                   SARAH POTTER
                                                   Attorney for Casey Goonan

SENTENCING MEMORANDUM - 15