CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

NIKHIL BHAGAT (CABN 279892)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7193
    FAX: (415) 436-6982
    nikhil.bhagat@usdoj.gov

Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 24-0414-JSW |
| Plaintiff, | **GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | |
| CASEY ROBERT GOONAN, | Sentencing Date:   September 23, 2025 |
| Defendant. | Sentencing Time:  1:00 p.m. |
| | Before: The Honorable Jeffrey S. White |

Pursuant to Local Criminal Rule 32-5 and Section 4 of this Court's Criminal Standing Order, the United States respectfully submits this response to the Defendant's Sentencing Memorandum.

## I. The Defendant's Medical Conditions Did Not Cause Him to Commit These Crimes, and He Has Used Those Conditions to His Strategic Advantage While in Custody.

Goonan argues that this Court should show him leniency because of his diabetes. *See, e.g.* Def. Sent. Mem. at 8–9. But in private, Goonan has admitted that he has used that diabetes as a weapon to get what he wants. As he explained to a friend in November 2024:

> One of my cellies in the pod I was in a few months ago was vegan and didn't receive a proper meal for several weeks in here, so we went on a hungerstrike for demands of the jail creating a regular "vegan meal option," which they did not have. **After 3 days the administration freaked out because I'm Type 1 diabetic and was adamantly refusing trays [food]**. I hunger struck here in June also, and won a smaller demand after going hypo-glamcimic [sic] quite dramatically, nearly collapsing after only 5 days. **The fact of my necessary insulin injections makes my body a potentially dangerous (in the good way) weapon as a hunger striker.**

Bhagat Decl. Ex. H[1] at USA-007504 (emphasis added). Elsewhere, the defendant described a plan to escape the Santa Rita Jail, one that also relied on his medical conditions to succeed: "The other night I was taken to the hospital for a diabetic complication. I'm doing okay now, but it was interesting to leave the jail for a few hours…." *See* Bhagat Decl. Ex. M at USA-007295–007296.

The defendant absolutely knew right from wrong at the time of his crimes, and knew right from wrong in the months since, as he bragged about those crimes to others. He has never noticed an insanity defense. He pleaded guilty at a hearing where the Court assessed that he fully understood the charges against him and recognized the rights he was eschewing by pleading guilty. The Court found that the decision to plead guilty was knowing and intelligent. *See generally* Fed. R. Crim. P. 11. And his pretrial communications show a greater-than-average understanding of the federal criminal process and the attendant consequences. The defendant's own expert report describes him as well-groomed with a linear thought process and no looseness of association or flight of ideas. Def. Mem. Ex. B at 6. And the medical records on which the defendant's expert relies, particularly those that reflect examinations while Goonan has been in custody, reflect that treating medical staff who interacted with him observed him as

---

[1] Citations to "Bhagat Decl. Ex," followed by a letter are to the Declaration of Nikhil Bhagat in Support of the Government's Sentencing Memorandum, ECF No. 60. For clarity, the exhibits attached to the declaration accompanying this document will be labeled by number (1, 2, 3, etc.).

a linear thinker and a rational actor. *See, e.g.* Def. Mem. Ex. B at 20 ("He had a linear and logical thought process . . . . He had a tangential thought process and anxious affect"); 22 ("[H]e had linear thought process"). And as described in the government's sentencing memorandum and the PSR, the defendant developed his violent, anti-law enforcement, anti-government ideology long before 2024, and advocated for violence in contexts far outside the Palestinian cause that he now claims to hold so dear. While he was a Northwestern student, he endorsed looting, shooting police officers, arson, and theft. PSR ¶ 23. Four years before the crimes for which he came before this Court, he was already thinking about Molotov cocktails and advocating for their use, as evidenced by his social media postings even then. *Id.*

The defendant's actions over a several week period in June were not the result of some kind of "mental health break," Def Mem. at 7. They were considered, well-planned, and pre-mediated. Recall the instructions the defendant published in his pamphlet, which encouraged individuals who would seek to commit crimes to, among other things, wear a face mask and a hair net to avoid leaving DNA evidence. Bhagat Decl. Ex. D at USA-002849. His writings suggest that he was focused on the goal that he and his followers be able to commit crimes—including violent crimes—without getting caught: "What plays right into the hand of police is the fact that clothing fibers, which have been the focus of forensics all over the planet for decades, almost always yield usable DNA of the person wearing the clothes." *Id.* "Either smash it or burn it –not both," wrote Goonan. "Smashing something can sometimes involve a lot of contact with the object, which risks transferring DNA traces to the object in question (especially if you have to climb onto it). Sustained fire will destroy DNA traces but for an object that is first smashed and then burned this is no guarantee." *Id.* As part of a plan to "disappear completely," he urged other criminals to "change clothing" and "follow your exit plan." And Goonan practiced what he preached: he followed his own advice. During the UCPD firebombing, he wore dark clothing and had full coverage of his face, and he arrived in a car that parked several blocks away. *See* Bhagat Decl. Ex. A; PSR ¶ 8; Crim. Complaint, ECF No. 1. For the June 16 arson, at least, he had a change of clothes and had a dedicated exit plan. *See* Bhagat Decl. Ex. B at USA-001189–USA-001190 (FBI 302 describing items found during search warrant); Bhagat Decl. Ex. C (exit plans depicting UC Berkeley campus). "Leave your phone out of this," cautioned Goonan. "Not just turned off. It should

1  not be in the vicinity of, or used in conversations, planning or the fun itself. **Your phone is an informant**

2  that snitches on you." Bhagat Decl. Ex. D at USA-002852 (emphasis in original).  The cell phone

3  evidence shows that as to several of the arsons, including the UCPD firebombing and the Oakland

4  federal building attack, Goonan left his phone at home—demonstrating careful, logical, rational pre-

5  planning to avoid detection.  *See* Bhagat Decl. Ex. 2 at USA-002587 (ATF report on defendant's cell

6  phone location data).  Other evidence also suggests premeditation.  In May 2024, weeks before his

7  Hamas-inspired string of violence, he looked up "UCB police station," and "Sproul Plaza" in a digital

8  maps application. Bhagat Decl. Ex. 3 at USA-003164.   And even on the day of the UCPD attack,

9  Goonan and his co-conspirator stopped at Bancroft and Telegraph in Berkeley—a vantage point that

10  gave them a clear view of the police cars parked outside the station—for a full minute to conduct

11  reconnaissance before driving off and eventually parking a few blocks away.  It was only then that

12  Goonan left his vehicle and walked to the station to firebomb the police car.  *See* Complaint, ECF No. 1

13  ¶ 14–15. Contrary to the Defendant's insinuations otherwise, Operation Campus Flood was not triggered

14  by the 34-year-old Mr. Goonan showing up to his parents' house and finding a guest staying in his

15  childhood bedroom.  It was the culmination of a lengthy period of consideration, rumination, and

16  reflection.

17  **II.    The Court Should Rely on the Defendant's In-Custody Conduct and His Communications
18  With Others, Not His Self-Serving Conclusory Statements at Sentencing, to Analyze His
     True Motivations and State of Mind in Determining an Appropriate Sentence**

19         In an effort to explain the defendant's disturbing and dangerous communications while he has

20  been in pretrial custody, the defense suggests that it was "not until March 2025 that he began

21  consistently taking Prozac to manage some of his mental health symptoms," Def. Mem. at 9, and implies

22  that the Court should simply ignore the pre-March correspondence as attributable to mental illness.  The

23  Court can read the letters for itself—they are largely lengthy academic expositions, the product of

24  rational thought and deep consideration.  As described in the government's sentencing memorandum,

25  *see* Gov't Sent. Mem. at 14 –15, the defendant *repeatedly* makes references to being able to distribute

26  his real thoughts—his true beliefs—after sentencing: "Don't worry, I'm going to release this after

27  sentencing, when there is no way it can affect my case."  Bhagat Decl. Ex. U at USA-007515.  Goonan's

28  letters are cogent, sophisticated, and calculating.  They are not the ramblings of a madman.

It is true that the defendant's volume of correspondence dropped in approximately March 2025. But that is not because he obtained a new prescription. It is because on February 20, 2025, the government first produced to his counsel copies of his correspondence that it had received from the Santa Rita Jail, as well as recordings of his jail calls. Bhagat Decl. ¶ 2. It was only then for the first time that Goonan realized that the government was paying attention to his communications. We know this because on February 17, 2025, Goonan discussed his writings with a correspondent, writing that "I was contemplating asking if we could post all of the writings on April 9th, the day immediately after my sentencing hearing; however, its probably best to let the news of my sentence simmer for a week, and then drop the writing on a more special day." Bhagat Decl. Ex. Q at USA-007657. By February 28, 2025—eight days after the government made its production—Goonan suddenly urged his friends to be more careful. "The other day I learned that nearly the entirety of my outgoing letters . . . and other correspondence has been digitized since June, by the F.B.I. – along with every single phone call and visit audio." Bhagat Decl. Ex. V at USA-007654. He admitted that he had been "a bit reckless" in sharing his true thoughts over the phone and wanted to remind them that he was "still not sentenced and all words of mine or others, outgoing and incoming" could affect the sentence. *Id.*

And there is additional evidence that he continued to espouse this violent worldview after March 2025. Throughout his pretrial detention, Goonan has been in touch with S.E., a graduate student who he has tasked with, among other things, compilation and transcription for his book. *See* Bhagat Decl. Ex. F at USA-008210 (Goonan asking S.E. to send him book manuscript). On May 19, 2025—well after his medication was altered and after he had dramatically limited his outside communications because he didn't want the government to read or listen to them, Goonan had a conversation with S.E. *See* Bhagat Decl. Ex. 1. In that call, he read to her an article that he believed that he could not yet send in the mail (presumably for fear of it being seen by the government). In the call, Goonan characterizes the events of "last Spring"—presumably including his own conduct—as a manifestation of "anticolonial urgency" and again endorses Hamas's October 7 attacks. *Id.* at 24:00 – 24:35. He identifies himself and others as "targets of this peculiar historically specific wave of ongoing oppression." 25:40–25:51. Goonan again labels himself a "political prisoner," and notes that "some of us can even be called prisoners of war." *Id.* 26:00 – 26:16. This is consistent with his previous writing, in which he refers to himself as a political

1    prisoner and a "P.O.W."  In a discussion with S.E. afterwards, he reaffirms the idea of publishing his

2    writings, and notes that "there are so many ideas I want to communicate." *Id.* at 46:50 –47:00.  In

3    Goonan's view, "[s]omething's happened since 2020. And also since like 2023 . . .. It's almost like de-

4    militancy. Like unmilitancy." *Id.* 47:15 –47:37. Goonan expressed his frustration that people were only

5    upset at the government's mistreatment of individuals when that mistreatment happened to the innocent,

6    and he again denounced peaceful action as a way to affect change and reaffirmed what he had said in

7    previous statements: "And its just like, like, pacifism is crazy. Its just like, just like, there are multiple

8    statements in my [Presentence Investigation Report] that are like block quotes like basically saying

9    exactly what I just said . . . But it is, I just find it like…its just so true." *See id.* 48:15–49:35.  Goonan's

10   actions, and his promotion of violent tactics, are not the result of a psychiatric episode. They are the

11   considered, rationally based views of a highly-intelligent actor who knows exactly what he is doing.

12   **III.    The Defendant Continues to Show No Remorse for His Actions.**

13        A defendant's remorse is important because it gives the Court a sense of the person's

14   amenability to rehabilitation.  It informs the Court's view of whether a defendant will continue to be

15   dangerous following a period of incarceration.  Here, the defendant has, to this day, not shown any

16   remorse.  The Court can see it from his letters, and his drawings, and his consistent attempts to beat the

17   system, and his refusal to make a statement to probation.  The Court knows that the defendant has no

18   remorse because he will be publishing a book following this sentencing that includes his claims of

19   responsibility for the June 2024 attacks.  The Court knows that the defendant has no remorse because he

20   has made no efforts to take his claims of responsibility down from the Internet—those posts are still up,

21   deliberately placed by Goonan on websites that he knows the government cannot reach.   The Court

22   knows that from what it knows about this case, and the insight it has into Goonan's thoughts and

23   communications when he thought the Court was not watching.  As Goonan said to S.E. in May of this

24   year, he still believes the statements in his PSR to be true.  And even the defendant's letter to the Court

25   reads like the most lawyerly of documents. *See* Def. Sent. Mem. Ex. C.  It speaks of "reckless and

26   harmful decisions" (harmful to whom?) and "potential harm" that his actions "may" have caused.  But it

27   takes the greatest of pains to avoid saying "I'm sorry" or "I regret my actions."  Because he is not sorry.

28   He is not regretful.  He is proud.

**IV.    The Proposed Conditions of Release Are Rationally Related to the Goals of Deterrence, Protection of the Public, and Rehabilitation of the Offender.**

In this case, the defendant used the Internet to publicize his crimes, and to recruit others to join him. Moreover, the pamphlet he created, Bhagat Decl. Ex. D, was (and is) posted on the Internet. That pamphlet specifically directs others to cover their tracks by, among other things, only using TAILS USB or Quebes-Whonix to research directions, location, and anything else related to their criminal activity. *See id.* at USA-008252. The Tails operating system is specifically designed to be used from a removable drive and leave no trace of its activity on the computer system itself. It is often used by actors engaging in criminal activity, including accessing the dark web, who wish to conceal that activity from law enforcement. Qubes-Qhonix is a popular combination of a virtual machine and operating system designed to do the same thing. The fact that the defendant is sophisticated enough to use such means to commit his crimes, and to encourage others to do so, combined with his use of particular web hosting servers that are known to be hostile to lawful process to publicize his crimes and encourage others to join him, means that special conditions 1 through 3 are substantially related to the goals of sentencing and supervised release and should be imposed in this case.

Moreover, with respect to special condition 4, which would preclude the defendant from possessing or using any data encryption technique or program, the defendant's reliance on *United States v. Goddard*, 537 F.3d 1087 (9th Cir. 2008) is misplaced. *Goddard* dealt with a *total* ban on software modifications—i.e. routine updates, many of which can happen automatically without the user knowing. The proposed condition here simply precludes the defendant from *actively*—volitionally—possessing or using an encryption technique, like the TOR browser or PGP keys. That is rationally related to the defendant's crimes and the purposes of sentencing. The Court should also impose special condition 4.

**V.    188 Months is a Downward Variance From the Guidelines and is Sufficient But Not Greater Than Necessary to Achieve the Goals of Sentencing.**

The defendant's guideline range is 235 to 240 months, and for good reason. He committed dangerous crimes in an effort to influence and affect the conduct of government by intimidation and coercion and to retaliate against government conduct. *See* Plea Agmt. ¶ 2. To be clear: no matter how much the defendant thinks of himself as a "political prisoner," he is not being punished for holding offensive views. Were that his only transgression, he would not be before the Court today.

But in assessing any defendant's history and characteristics and determining a sentence that is sufficient but not greater than necessary to achieve the purposes in the statute, the Court must assess that defendant's mindset. Mr. Goonan's deeply held and unrepentant views that violence is the answer make him more likely to reoffend. Simply put, it *matters*, and matters greatly, that the defendant undertook these violent actions for a broader purpose and continues to believe in and espouse a violent ideology. It matters for just punishment, and it matters for promotion of respect for the law. *See* 18 U.S.C. § 3553(a)(2)(A). Statutory sentencing considerations of specific deterrence, general deterrence, and public protection, too, require a lengthy period of incarceration.

To the extent the Court believes that some downward variance is appropriate in consideration of the defendant's past struggles, the 47-month downward variance which the government recommends here is more than sufficient to account for those challenges.

The Court should impose a sentence of 188 months in prison, followed by 15 years of supervised release subject to the conditions proposed by the probation officer, as well as restitution and forfeiture.

Dated: September 18, 2025                    Respectfully submitted,

                                             CRAIG H. MISSAKIAN
                                             United States Attorney

                                             */s/ Nikhil Bhagat*
                                             NIKHIL BHAGAT
                                             Assistant United States Attorney